UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KRISTINA ERNST, M.D.,

                              Civil Action No.:

           Plaintiff,

   -against-                        **COMPLAINT AND**
                                           **JURY DEMAND**

AMERICAN BOARD OF INTERNAL MEDICINE

           Defendant.
-------------------------------------------------------------------X

Plaintiff, Kristina Ernst, M.D. ("Plaintiff," or "Dr. Ernst"), by and through her undersigned counsel, respectfully states for her Complaint as follows:

<u>**Nature of the Action**</u>

1.     This is an action under Title III of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12101 *et. seq*., and State and local anti-discrimination laws, to require the Defendant, the American Board of Internal Medicine ("Defendant" or "ABIM"), to provide Dr. Ernst with a reasonable accommodation for her disability while she takes the ABIM's Initial Certification Examination.

2.     Dr. Ernst's disability consists of cognitive impairments, including, without limitation, the cumulative effects of years of seizures, combined to cause neurological problems that impair her word retrieval ability, working memory and processing speed, *i.e.* she has difficulty retrieving information that she knows under time constraints.

3.     Furthermore, such impairments are greatly exacerbated by her double anxiety disorder characterized by specific situational phobia and panic disorder.

4.     The combined cognitive impairments and anxiety disorders constitute her disability.

5.    Dr. Ernst's disability does not prevent her from acquiring, understanding and retaining information, including the complex medical knowledge required of her position, and applying such knowledge in her practice.

6.    In fact, in her current position as a doctor of internal medicine Mount Siani Beth Israel Hospital ("Beth Israel Hospital"), the hospital has given Dr. Ernst consistently excellent clinical reviews, noting her strengths in clinical care and teaching medical students.

7.    Dr. Ernst's disability does, however, make her passage of the Initial Certification Examination an insurmountable obstacle without the reasonable accommodation of access to a medical reference website called "UpToDate" while taking the examination.

8.    UpToDate acts as a form of reference material relied upon by doctors for the diagnoses and treatment of medical problems.

9.    Given Dr. Ernst's impairments to her rapid recall ability when needing to answer a question, using UpToDate would aid her by triggering her memory to recall information that she knows but is unable to express within the necessary time frame, and knowing that she is able to use UpToDate would help alleviate that part of her disability attributable to the crippling impact of her anxiety disorder on her cognitive function.

10.    UpToDate is routinely used by Dr. Ernst and her fellow doctors as an integral part of their practice and, in fact, the ABIM permits doctors to utilize UpToDate when taking their recertification examinations administered by the ABIM.

11.    Dr. Ernst requested that she be permitted to utilize UpToDate as a reasonable accommodation, but the ABIM refused to do so without even engaging Dr. Ernst in a meaningful interactive dialogue to arrive at a solution.

12.     Indeed, the ABIM rejected her request based on the evaluation of a person who has never examined her.

13.     Not only are the ABIM's actions contrary to the law, they make a mockery of its own policy for persons with qualifying disabilities to "offer alternative accessible arrangements for such individuals, where feasible," and they cannot be reconciled with the plain fact that UpToDate has been a much heralded part of the ABIM's recertification examinations since approximately 2018.

14.     As more fully alleged below, if Dr. Ernst is not provided with the reasonable accommodation requested, her disability will prevent her from passing the Initial Certification Examination and, consequently, will prevent her from continuing her career in internal medicine.

## The Parties

15.     Dr. Ernst is a physician licensed to practice medicine by the State of New York, and is a citizen of the State of New York residing in Kings County.

16.     The ABIM is a nonprofit corporation formed in Iowa and maintains its headquarters at 510 Walnut Street, Suite 1700, Philadelphia, PA 19106.  The ABIM grants certifications and recertifications in internal medicine and other areas of the medical field by, among other things, creating, developing and administering examinations.

## Jurisdiction and Venue

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for Plaintiff's claims arising under the laws of the United States, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state and local laws.

18.     The Defendant transacts business in this judicial District by virtue of administering certification examinations in this judicial District, and the unlawful acts

3

undertaken and resulting injuries occurred in this judicial District.  Accordingly, venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b).

## Factual Background

### Dr. Ernst's educational and professional background

19.     Dr. Ernst attended Barnard College from 1999 through 2003, graduating with a Bachelor of Arts in Art History.

20.     Following her college graduation and for the next eight years she worked in an art gallery in New York, New York.

21.     In or about late 2008 Dr. Ernst decided to pursue a career in medicine, and from 2009 through 2012 engaged in her pre-med post-baccalaureate study at Columbia University.

22.     Dr. Ernst passed her MCAT examination in 2010 and began medical school training at the New York University School of Medicine in the fall of 2011.

23.     Shortly thereafter, also in the fall of 2011, Dr. Ernst was forced to take a leave of absence from medical school due to her seizures becoming increasingly frequent.

24.     Dr. Ernst began treatment under a new neurologist, her seizures subsided, and she re-started medical school in the fall of 2012.

25.     Dr. Ernst graduated from the New York University School of Medicine in 2016, earning a degree as a Doctor of Medicine.

26.     After her graduation, in July 2016, Dr. Ernst undertook her residency training in Internal Medicine at SUNY Downstate located in Brooklyn, New York, and completed the three-year residency requirement in June 2019.

27.     Later that year, Beth Israel Hospital, located in New York, New York, hired Dr. Ernst as doctor of internal medicine, with the title of "instructor."

28.    The Hospital promoted her about three years later and gave her the title of "assistant professor."

29.    Throughout her employment by the Hospital, the Hospital has given Dr. Ernst consistently excellent clinical reviews, noting her strengths in clinical care and teaching medical students.

30.    Dr. Ernst and her fellow doctors routinely utilize a website called "UpToDate" in their practice of medicine.

31.    UpToDate is a reference website for the medical field that, *inter alia*, assists doctors in making clinical decisions for their patients, including medicines to prescribe and treatment to implement.

32.    Upon information and belief, the ABIM permits physicians taking recertification examinations who are not disabled to use UpToDate during their examination.

33.    Use of UpToDate will permit Dr. Ernst to more quickly retrieve information she readily knows but is unable to access quickly because of her disabilities as described below.

34.    Nothing in the Hospital's reviews of Dr. Ernst over the course of her approximately years of employment indicates she is unable to competently perform the duties required of her position.

**Dr. Ernst's historical and current disabilities**

35.    Dr. Ernst has a history of localization-related epilepsy with the onset at age sixteen.

36.    Her first seizure was a grand mal seizure, now referred to as a complex total seizure, and in the post-ictal stage (*i.e.*, the time period between the end of a seizure and return to

baseline) of her seizures, Dr. Ernst, as is typical of others who suffer a seizure, experienced trouble answering questions for minutes to hours.

37.    Her parents had her evaluated by a pediatric neurologist soon thereafter and she was prescribed anti-seizure medication.

38.    Dr. Ernst's next seizure was two years later and was a complex partial seizure with loss of consciousness.

39.    Ultimately, Dr. Ernst was diagnosed with left temporal lobe epilepsy.

40.    Around the time of her second seizure Dr. Ernst began attending Barnard College.

41.    During her freshman year of college she experienced the onset of symptoms of depression and anxiety, and soon after such onset she was diagnosed with major depression.

42.    She started seeing a psychiatrist and began taking anti-depressant medications.

43.    Just prior to beginning her pre-med post-baccalaureate studies at Columbia University, Dr. Ernst suffered a severe depressive episode that led her to seek more intensive psychiatric treatment.

44.    She was prescribed different anti-depressant medication and was treated with augmenting psychotherapy.

45.    However, when her depression did not remit substantially, she was admitted to NYU for electroconvulsive therapy (ECT) and after her discharge she continued treatment by her therapist.

46.    As her condition improved, she was able to begin her pre-med post-baccalaureate program at Colombia University.

47.    Nevertheless, her conditions of depression and anxiety persist today and are managed via treatment by a psychiatrist and prescribed medication.

48.     During her studies at Columbia University, at age 29, Dr. Ernst experienced another seizure.

49.     About two years later, in the fall of 2012, during her first semester of medical school Dr. Ernst experienced a cluster of seizures.

50.     Although her neurologist at the time, Stanley Resor, M.D., adjusted her medication, the seizures could not be brought under control, and he recommended that she take medical leave from school in order to bring her seizures under better control.

51.     She did so, and she returned to school the following year after her medical condition improved under the care of a new neurologist, David Friedman, M.D.

52.     She was seizure-free until she was nearing the end of her residency in Internal Medicine at which point she began to experience left-sided simple partial seizures several times each month.

53.     During medical school and her residency Dr. Ernst passed the United States Medical Licensing Examination (the "USMLE"), which is a three-step test series that medical graduates must pass to practice medicine in the United States.

54.     However, towards the end of her residency and while she studied intensely for Step 3 of the USMLE examination, Dr. Ernst was plagued by multiple left sided simple partial seizures.

55.     Although she passed Step 3, she did not perform well on the test.

56.     Her physician began to adjust her medications, but her seizures continued at the rate of approximately three seizures monthly.

57.     She again switched neurologists in 2021 to Lara Marcuse, M.D. Dr. Marcuse made additional changes in Dr. Ernst's medications, to Lamictal and Keppra and Xcopri, and she repeated testing including neuroimaging.

58.     Dr. Marcuse suggested brain surgery to place a responsive neurostimulator (RNS) in order to bring Dr. Ernst's seizures under better control.

59.     In the summer of 2022, Dr. Ernst underwent neurosurgery with Fedor Panov, M.D. and has had fewer seizures since the surgery.

60.     However, such surgery did not, and could not, have erased the cumulative deleterious effects of Dr. Ernst's history of seizures.

**Dr. Enrst Is Required to Pass the ABIM's Initial Certification Examination**

61.     Hospitals in New York State require doctors of internal medicine to have passed the Initial Certification Examination administered by the ABIM within approximately two to three years from the time the doctor completes his or her residency.

62.     Beth Israel imposes a three-year deadline for doctors of internal medicine to pass such examination.

63.     Due to Dr. Ernst's disabilities, as more fully described below, the Hospital extended the three-year time-period for Dr. Ernst.

64.     The ABIM also requires that candidates pass the Initial Certification Examination within seven (7) years of becoming board-eligible.

65.     The seven-year eligibility period applicable to Dr. Ernst expires on August 31, 2026.

66.     Upon passage of the Initial Certification Examination, a doctor of internal medicine is commonly known as a "Board Certified" doctor of internal medicine.

67.    A Board Certified doctor of internal medicine must maintain his or her certification by, among other things, taking and passing periodic recertification examinations.

**Dr. Ernst's prior Initial Certification Examinations and prior accommodations**

68.    Since completing her residency and beginning to work as an attending physician, Dr. Ernst has been studying for the ABIM examination.

69.    The Initial Certification Examination is an extremely challenging examination requiring extensive preparation, physical and mental stamina for the lengthy examination (four blocks of two hours), the ability to remember learned material on the spot, and to read, concentrate and think clearly under time pressure.

70.    Dr. Ernst has taken the Initial Certification Examination three times.

71.    She studied intensely for each examination for over six months prior to taking each one.

72.    Due to Dr. Ernst's medical disabilities, Dr. Ernst was unable to pass the Initial Certification Examination in the three times she has taken it.

73.    The first time Dr. Ernst took the examination in 2019 she ran out of time and could not complete it.

74.    She subsequently underwent a neuropsychological evaluation with Evan Drake, Ph.D, and based on the results of that evaluation, applied for and was granted extra time to take the test as an accommodation.

75.    Dr. Ernst took the examination for the second time, in 2020, but she again ran out of time and could not complete it despite the extra time accommodation provided to her.

76.     The third time she attempted the examination, in 2021, Dr. Ernst was provided extra time again, but she was unable to finish it and experienced intense anxiety and panic throughout the examination.

**An expert report explains the devastating effects of Dr. Ernst's disabilities on her ability to pass the Initial Certification Examination**

77.     In February 2023, Dr. Ernst was examined by Karen L. Dahlman, Ph.D, a clinical neuropsychologist, for a comprehensive neuropsychological evaluation for diagnostic clarification, and to evaluate the impact of her neurological and emotional challenges on her ability to undertake the Initial Certification Examination.

78.     Dr. Dahlman conducted a clinical interview with Dr. Ernst on February 8, 2023, reviewed Dr. Ernst's medical history and administered a battery of tests on Dr. Ernst, namely: the California Verbal Learning Test, Third Edition (CVLT-3); Nelson Denny Reading Test (NDRT) Form I; Personality Assessment Inventory (PAI); Rey-Osterrieth Complex Figure Test (RCFT); Scholastic Abilities Test for Adults (SATA), Reading Comprehension subtest; Test of Visual Attention (TOVA), Visual and Auditory subtests; Validity Indicator Profile (VIP), Verbal and Nonverbal subtests; Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), select subtests; Wisconsin Card Sorting Test (WCST); and Woodcock-Johnson Tests of Achievement, Fourth Edition (WJ-IV), select subtests.

79.     Dr. Dahlman compiled an Independent Medical Evaluation ("IME") report that set forth her expert conclusions regarding Dr. Ernst.

80.     Dr. Dahlman concluded that Dr. Ernst suffered from a neurocognitive disorder primarily caused by Dr. Ernst's long history of chronic seizures.

81.     Seizures are traumatic experiences for the human brain, and the more seizures a person experiences over time the more likely they are to impair a person's brain function.

82.     In fact, Dr. Ernst's cognitive condition has not remained static since she began experiencing seizures in her teenage years.

83.     The compounding and cumulative effects of Dr. Ernst's seizure disorder have increasingly caused, as documented in the IME, impairments to Dr. Ernst's word retrieval ability, working memory and cognitive processing speed.

84.     These impairments are present on a daily basis, but do not negatively affect Dr. Ernst's ability to perform all aspects of her duties because in the event she has difficulty retrieving a word or phrase from her memory, she has ample time to prompt herself via UpToDate or via discussing the context with other medical personnel.

85.     Dr. Ernst is a skilled and experienced physician.

86.     Dr. Ernst has consistently received excellent reviews from her employer.

87.     These cognitive impairments combined with Dr. Ernst's anxiety disorders do, however, severely affect Dr. Ernst's test-taking ability.

88.     Moreover, Dr. Ernst's impairments are exacerbated by her anxiety and depressive disorders, which are themselves elevated during the Initial Certification Examination.

89.     Because Dr. Ernst is aware, in the moment, that her disability negatively affects her test performance, the symptoms of her anxiety and depressive disorders become even more elevated, in turn, further aggravating her disability; a vicious cycle according to Dr. Dahlman, which prevents Dr. Ernst from accessing the entire examination even with the extended time provided by the ABIM.

90.     The scores of Dr. Ernst's Initial Certification Examination do not accurately reflect her medical knowledge or abilities.

91.     The battery of tests that were administered by Dr. Dahlman on Dr. Ernst revealed she possessed the intellectual ability to comprehend complex medical knowledge but was stymied in her ability to apply it in a high-pressure test-taking environment.

92.     For example, the magnitude of the discrepancy between Dr. Ernst's Full-Scale IQ score and her General Ability Index score (which removes working memory and processing speed from the equation and provides a better estimate of a subject's overall intellectual functioning) is only found in less than 1% of the applicable sample for her age.

93.     Similarly, the magnitude of discrepancy between her weak working memory and strong verbal comprehension is rare and found in only 0.1% of the applicable sample for her age.

94.     As another example, the tests of Dr. Ernst's verbal functioning revealed extremely rare results.

95.     Dr. Ernst scored in the 99th percentile for verbal IQ.

96.     However, for the Boston Naming Test, which shows the patient simple line drawings of objects (*e.g.*, a house, a bed, a boomerang) and asks the patient to identify them, Dr. Ernst scored in the 21st percentile, failing to identify various common objects without prompting.

97.     As set forth in the IME, Dr. Ernst meets the criteria for a cognitive disorder secondary to her medical condition.

98.     She meets the criteria for the following conditions: (a) Mild Neurocognitive Disorder Due to Seizure Disorder Due to Other Medical Disorder (Seizure Disorder with mixed complex mood, anxiety, and panic disorder); (b) Unspecified Depressive Disorder; (c) Specific Phobia, Situational; and (d) Panic Disorder.

99.     Dr. Ernst's disability, which has intensified with the compounded, cumulative effect of multiple seizures over the years, now prevents her from being able to retrieve the

abundant medical information she has learned and display it on the Initial Certification Examination under standard time constraints and without specialized accommodations.

100.    To ensure that Dr. Ernst has the best possible chance for her examination results to accurately reflect her aptitude in internal medicine, rather than reflecting her impaired skills, Dr. Dahlman recommended that Dr. Ernst seek various accommodations including access to UpToDate, which is routinely used by her and other physicians in their daily practice, and routinely used by physicians during their ABIM recertification examinations.

101.    Dr. Ernst requires the accommodation of access to UpToDate in order to access the ABIM examination and achieve the goal that is well within her intellectual reach despite her neurocognitive disorder due to her medical conditions.

**The ABIM wrongfully denies Dr. Ernst a reasonable accommodation for the Initial Certification Examination**

102.    By letter dated September 14, 2023, from Dr. Ernst's attorneys to the ABIM, Dr. Ernst requested the same six accommodations recommended by Dr. Dahlman for when she retakes her Initial Certification Examination in August 2024 (two of such six accommodations, a private room and double-time, had previously been offered by the ABIM).

103.    The letter enclosed Dr. Dahlman's report that explained why the accommodations for Dr. Ernst were necessary.

104.    By letter dated November 7, 2023 (the "ABIM Denial Letter"), the ABIM, by its attorneys, responded to Dr. Ernst's September 14, 2023 letter.

105.    In the ABIM Denial Letter, the ABIM disputed the existence of Dr. Ernst's disabilities, continued the two prior accommodations previously given to Dr. Ernst, granted Dr. Ernst's request for a quiet distraction-reduced room, but denied Dr. Ernst's other three requests

(stop-the-clock breaks, oral or longhand examination in place of multiple choice, and access to UpToDate).

106.    The ABIM's refusal to provide Dr. Ernst with access to UpToDate is unreasonable.

107.    Dr. Ernst and all of her fellow doctors at the Hospital routinely, almost daily, use and rely upon UpToDate to guide their patients' medication and treatment.

108.    Moreover, the ABIM expressly permits Board Certified doctors of internal medicine to utilize and rely upon UpToDate in taking the recertification examination administered by the ABIM.

109.    According to a press release issued by the ABIM on September 27, 2017, available at https://www.abim.org/media-center/press-releases/abim-open-book-assessments-will-feature-access-to-uptodate.aspx, "Beginning in 2018, physicians will be able to access UpToDate® - an online, evidence-based clinical decision support resource - during [the ABIM] Maintenance of Certification (MOC) assessments."

110.    The press release also states, "UpToDate will be the first online resource available during traditional MOC exams physicians take every 10 years, as well as the ABIM's new, shorter MOC assessment option - called Knowledge Check-Ins - that physicians can take every two years from their home or workplace."

111.    The press release acknowledges the critical role of UpToDate in physicians' clinical practice, the excellence of which is safeguarded by a physician's ability to pass certification examinations: "Physicians taking either of these assessment options will be able to access UpToDate in real time during the assessment, better reflecting how they look up clinical guidelines and evidence in practice."

14

112.    In fact, the ABIM decided to incorporate the use of UpToDate into its examinations based in part by physicians' input:  "'After hearing requests for open-book exams, ABIM talked with doctors about how they practice today and what online resources they use,' said Richard J. Baron, MD, President and CEO of ABIM. 'Many told us they use UpToDate to access current clinical information, so we worked to incorporate this resource into new MOC assessments. This innovation allows ABIM to be responsive to changes in medical practice while maintaining assessments with meaningful standards that doctors and patients trust.'"

113.    Critically,    the    ABIM's    incorporation    of    UpToDate    into    examination administration is due in part to the exact same reason Dr. Ernst seeks the use of UpToDate as a testing accommodation; the press release states, "More than 800 doctors participated in a separate research study to help ABIM determine the feasibility and impact of incorporating electronic resources into traditional MOC exams.  The results indicated that having access to resources reduced physicians' anxiety about the exam and that the open-book option actually enhanced the exam's capacity to differentiate between high and low performances.  Additionally, 90 percent of physicians who participated in a survey following the study indicated that they use UpToDate in practice."

**Obtaining the requested reasonable accommodation is critical to Dr. Ernst's career**

114.    Although Beth Israel Hospital provided Dr. Ernst with an extension of time to pass the Initial Certification Examination, Beth Israel Hospital is closing Dr. Ernst's location as of July 2024 and her contract with Beth Israel Hospital expires in June 2024.

115.    Due to Beth Israel Hospital's closure, for months, Dr. Ernst has been applying for job openings at hospitals throughout New York City.

116.    She has not received even one interview.

117.    Upon information and belief, Dr. Ernst's lack of Board Certification over four and one-half years after she finished her residency is a hiring barrier for potential employers; a belief that has been confirmed to Dr. Ernst by various recruiters who have been working with her to place her at another hospital.

118.    Upon information and belief, no hospital or medical practice will hire Dr. Ernst unless and until she becomes Board Certified.

119.    The Initial Certification Examination is only offered in August, and since Dr. Ernst will be losing her job in June 2024, it is imperative that she be able to take the examination in August 2024 with the reasonable accommodation requested.

## FIRST CLAIM FOR RELIEF
### (violation of the ADA)

120.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

121.    Dr. Ernst is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12101 *et. seq*. due to the combination of her cognitive impairments and anxiety disorders as more particularly described above.

122.    Her disability prevents her from taking and passing the Initial Certification Examination without a reasonable accommodation.

123.    Defendant administers the Initial Certification Examination, which Dr. Ernst is required to pass in order to maintain her employment at Beth Israel Hospital and/or to obtain and maintain employment in New York State's other hospitals.

124.    Said examination is related to applications and credentialing for postsecondary education, professional, and trade purposes, within the meaning of the ADA, 42 U.S.C. § 12189.

125.    The ADA requires the ABIM to offer these examinations in a manner accessible to persons with disabilities.

126.    The accommodation that Dr. Ernst needs, which she has requested and been denied, is access to UpToDate during the Initial Certification Examination.

127.    Such access would not impose a fundamental alteration of the examination or impose any hardship on the ABIM in administering the examination, but instead will level the playing field with others who take the examination and allow Dr. Ernst's aptitude and abilities to be fairly and accurately measured.

128.    Defendant refused Dr. Ernst's requested accommodation in bad faith and failed to engage with Dr. Ernst in a good faith interactive or cooperative process or dialogue that could assess her needs and the reasonableness of her requested accommodation.

129.    Title III of the ADA, which is enforced by the U.S. Department of Justice, states in pertinent part, "It is discriminatory to fail to make reasonable modifications to policies, practices, and procedures when necessary to provide goods and services to a person with a disability." 42 U.S.C. § 12182(b)(2)(A)(ii).

130.    The Department of Justice regulations mandate that a private entity offering such examinations ensure that the examination is administered so as to "best ensure" that "the examination results accurately reflect the individual's aptitude or achievement level or whatever other fact the examination purports to measure," rather than measuring the extent of the individual's disability. 28 C.F.R. § 36.309(b).

131.    The ABIM has discriminated and continues to discriminate against Dr. Ernst on the basis of her disability by denying her an equal opportunity to demonstrate her aptitude and achievement level on the Initial Certification Examination in violation of the ADA and the

regulations promulgated thereunder, including, without limitation, 42 U.S.C. §§ 12182, 12189 and 28 C.F.R. § 36.309.

132.    Dr. Ernst will be irreparably harmed if the ABIM continues its unlawful refusal to provide her the appropriate test accommodations as requested and unless this Court grants injunctive relief prohibiting the continued violation of Dr. Ernst's rights and compelling the ABIM to provide the requested accommodation.

133.    The ABIM's conduct constitutes an ongoing and continuous violation of the ADA and unless enjoined, said conduct will continue to inflict injuries for which Dr. Ernst has no adequate remedy at law.

134.    Consequently, Dr. Ernst is entitled to injunctive relief and reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 12188, 2000a-3.

<b>SECOND CLAIM FOR RELIEF</b><br><b><u>(violation of the NYSHRL)</u></b>

135.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

136.    Dr. Ernst is an individual with a disability within the meaning of the New York State Human Rights Law ("NYSHRL"), Article 15 of the New York Executive Law § 290, *et. seq.* due to the combination of her cognitive impairments and anxiety disorders as more particularly described above.

137.    Her disability prevents her from taking and passing the Initial Certification Examination without a reasonable accommodation.

138.    Defendant administers the Initial Certification Examination, which Dr. Ernst is required to pass in order to maintain her employment at Beth Israel Hospital and/or to obtain and maintain employment in New York State's other hospitals.

139.    The NYSHRL requires the ABIM to offer these examinations in a manner accessible to persons with disabilities.

140.    The accommodation that Dr. Ernst needs, which she has requested and been denied, is access to UpToDate during the Initial Certification Examination.

141.    Such access would not impose a fundamental alteration of the examination or impose any hardship on the ABIM in administering the examination, but instead will level the playing field with others who take the examination and allow Dr. Ernst's aptitude and abilities to be fairly and accurately measured.

142.    Defendant refused Dr. Ernst's requested accommodation in bad faith and failed to engage with Dr. Ernst in a good faith interactive or cooperative process or dialogue that could assess her needs and the reasonableness of her requested accommodation.

143.    Such access would not impose a fundamental alteration of the examination, but instead will level the field and allow her aptitude and abilities to be fairly and accurately measured.

144.    The ABIM has discriminated and continues to discriminate against Dr. Ernst on the basis of her disability in violation of the NYSHRL by denying her an equal opportunity to demonstrate her aptitude and achievement level on the Initial Certification Examination in violation of the NYSHRL.

145.    Dr. Ernst will be irreparably harmed if the ABIM continues its unlawful refusal to provide her the appropriate test accommodations as requested and unless this Court grants injunctive relief prohibiting the continued violation of Dr. Ernst's rights and compelling the ABIM to provide the requested accommodation.

146.    The ABIM's conduct constitutes an ongoing and continuous violation of the ADA and unless enjoined, said conduct will continue to inflict injuries for which Dr. Ernst has no adequate remedy at law.

147.    Consequently, Dr. Ernst is entitled to injunctive relief and reasonable attorneys' fees and costs pursuant to the NYSHRL.

148.    As a result of the ABIM's violation of the NYSHRL, Dr. Ernst has suffered or will suffer great injury, including, but not limited to, lost employment opportunities, including a potentially life-long lost opportunity to practice as a doctor of medicine, out-of-pocket pecuniary losses, and severe emotional distress and anguish, in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**(violation of the NYCHRL - failure to provide reasonable accommodation)**

149.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

150.    Dr. Ernst is an individual with a disability within the meaning of the New York City Human Rights Law (the "NYCHRL"), Title 8 of the Administrative Code of the City of New York.

151.    Her disability prevents her from taking and passing the Initial Certification Examination without a reasonable accommodation.

152.    Defendant administers the Initial Certification Examination, which Dr. Ernst is required to pass in order to maintain her employment at Beth Israel Hospital and/or to obtain and maintain employment in New York State's other hospitals.

153.    The NYCHRL requires the ABIM to offer these examinations in a manner accessible to persons with disabilities.

154.    The accommodation that Dr. Ernst needs, which she has requested and been denied, is access to UpToDate during the Initial Certification Examination.

155.    Such access would not impose a fundamental alteration of the examination or impose any hardship on the ABIM in administering the examination, but instead will level the playing field with others who take the examination and allow Dr. Ernst's aptitude and abilities to be fairly and accurately measured.

156.    Defendant refused Dr. Ernst's requested accommodation in bad faith and failed to engage with Dr. Ernst in a good faith interactive or cooperative process or dialogue that could assess her needs and the reasonableness of her requested accommodation.

157.    The ABIM has discriminated and continues to discriminate against Dr. Ernst on the basis of her disability in violation of NYCHRL by denying her an equal opportunity to demonstrate her aptitude and achievement level on the Initial Certification Examination in violation of the NYCHRL.

158.    Dr. Ernst will be irreparably harmed if the ABIM continues its unlawful refusal to provide her the appropriate test accommodations as requested and unless this Court grants injunctive relief prohibiting the continued violation of Dr. Ernst's rights and compelling the ABIM to provide the requested accommodation.

159.    The ABIM's conduct constitutes an ongoing and continuous violation of the ADA and unless enjoined, said conduct will continue to inflict injuries for which Dr. Ernst has no adequate remedy at law.

160.    Consequently, Dr. Ernst is entitled to injunctive relief and reasonable attorneys' fees and costs pursuant to the NYCHRL.

161.    As a result of the ABIM's violation of the NYCHRL, Dr. Ernst has suffered or will suffer great injury, including, but not limited to, lost employment opportunities, out-of-pocket pecuniary losses, and severe emotional distress and anguish, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (violation of the NYCHRL – failure to engage in cooperative dialogue)

162.    Plaintiff repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein. Dr. Ernst is an individual with a disability within the meaning of the New York City Human Rights Law (the "NYCHRL"), Title 8 of the Administrative Code of the City of New York.

163.    Her disability prevents her from taking and passing the Initial Certification Examination without a reasonable accommodation.

164.    Defendant administers the Initial Certification Examination, which Dr. Ernst is required to pass in order to maintain her employment at Beth Israel Hospital and/or to obtain and maintain employment in New York State's other hospitals.

165.    The NYCHRL requires the ABIM to offer these examinations in a manner accessible to persons with disabilities.

166.    The accommodation that Dr. Ernst needs, which she has requested and been denied, is access to UpToDate during the Initial Certification Examination.

167.    The ABIM's issuance of the Denial Letter does not constitute an engagement in a cooperative dialogue on the part of the ABIM under the NYCHRL.

168.    The ABIM has discriminated and continues to discriminate against Dr. Ernst on the basis of her disability in violation of NYCHRL by failing to engage with Dr. Ernst in a good

faith interactive or cooperative process or dialogue that could assess her needs and the reasonableness of her requested accommodation.

169.    Dr. Ernst will be irreparably harmed if the ABIM continues its unlawful refusal to provide her the appropriate test accommodations as requested and unless this Court grants injunctive relief prohibiting the continued violation of Dr. Ernst's rights and compelling the ABIM to provide the requested accommodation.

170.    The ABIM's conduct constitutes an ongoing and continuous violation of the ADA and unless enjoined, said conduct will continue to inflict injuries for which Dr. Ernst has no adequate remedy at law.

171.    Consequently, Dr. Ernst is entitled to injunctive relief and reasonable attorneys' fees and costs pursuant to the NYCHRL.

172.    As a result of the ABIM's violation of the NYCHRL, Dr. Ernst has suffered or will suffer great injury, including, but not limited to, lost employment opportunities, out-of-pocket pecuniary losses, and severe emotional distress and anguish, in an amount to be determined at trial.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants as follows:

(i)    on the First Claim for Relief, (a) an injunction requiring Defendant to provide Plaintiff with access to UpToDate during its administration of the Initial Certification Examination to Plaintiff; and (b) reasonable attorneys' fees and costs;

(ii)    on the Second Claim for Relief, (a) an injunction requiring Defendant to provide Plaintiff with access to UpToDate during its administration of the Initial Certification Examination to Plaintiff; (b) monetary damages in an amount to be determined at trial; and (c) reasonable attorneys' fees and costs;

(iii)    on the Third Claim for Relief, (a) an injunction requiring Defendant to provide Plaintiff with access to UpToDate during its administration of the Initial Certification Examination to Plaintiff; (b) monetary damages in an amount to be determined at trial; and (c) reasonable attorneys' fees and costs; and

(iv)    on the Fourth Claim for Relief, (a) an injunction requiring Defendant to provide Plaintiff with access to UpToDate during its administration of the Initial Certification Examination to Plaintiff; (b) monetary damages in an amount to be determined at trial; and (c) reasonable attorneys' fees and costs; and

(v)    an order granting Plaintiff such other and further relief as this Court shall deem just, proper and equitable.

Dated:    Brooklyn, New York
        February 22, 2024

**ABRAMS FENSTERMAN, LLP**

By: /s/ *Justin T. Kelton*
    Justin T. Kelton
    Keith Corso
    One Metrotech Center, Suite 1701
    Brooklyn, New York 11201
    (718) 215-5300
    jkelton@abramslaw.com
    kcorso@abramslaw.com
    *Attorneys for Plaintiff*